UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA

- against -

                                                    17 Cr. 243 (SHS)


ANDREW OWIMRIN
                        Defendant
--------------------------------------------------------x

## MEMORANDUM OF LAW IN RESPONSE TO  SUPPORT OF GOVERNMENT'S MOTION IN LIMINE


Defendant Andrew Owimrin submits this memorandum in opposition to the

motion in limine filed by the government on September 18, 2018. Additionally, Mr.

Owimrin joins in the applicable portions of the responses filed by his co-defendant's

where they object to the government's motion.

The government's motion seeks to admit evidence at trial of

"communications" of alleged co-conspirators that were made during the course of

the wire fraud and money laundering conspiracies and in furtherance of the

conspiracies;[1] 2) certain documents found during the execution of a search warrant

---

[1] Since the government has used the term "communications" it is assumed that the "statements" in the form of emails and/or test messages.

1

at Shahram Ketabchi's residence;[2] and 3) testimony by cooperating witnesses Andrew Owimrins' purchase of oxycodone from co-conspirators and his provision of urine to Arash in order to permit Arash to obtain oxycodone that he later sold to Owimrin and others.

In addition to arguing for the admission of such evidence under Federal Rule of Evidence 801(d)(2)(E), the government argues that the documents are admissible to prove the state of mind of Mr. Ketachbi and the evidence relating to oxycodone is admissible for various reasons including the need to  (1) explain the development of the illegal relationship between participants in the conspiracy; (2) explain the mutual trust that existed between conspirators; or (3) complete the story of the crimes charged. offer various.  GM at 11. The government argues, alternatively, that this evidence is admissible under Federal Rule of Evidence 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, or if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial." GM at 12.

---

[2]  To prevent confusion, codefendant Shahram Ketachbi will be referred to as Ketachbi or Mr. Ketchabi.  Arash Katachbi will be referred to as Arash.

## I. Statements furtherance of the conspiracy

It is impossible to respond to the government's in limine request with adequate specificity without knowing what "communications" the government seeks to admit under  Federal Rule of Evidence 801(d)(2)(E).  While the Second Circuit may follow an inclusionary approach to some types of evidence, it does not for this issue. Thus, not every statement made by a co-conspirator is automatically a statement "in furtherance of the conspiracy."  A statement-by-statement analysis must be made by the Court to ensure that this portion of the rule is complied with.

### a.  The Meaning of "in Furtherance of the Conspiracy"

The "in furtherance of" requirement stems from the long-standing doctrine that the admissibility of statements by co-conspirators in part is attributable to the concept of co-conspirators as agents for each other and therefore the admissibility of statements which they may make should derive from their ability to act upon behalf of other co-conspirators, and, on the other hand, the limitations of their authority to act truly as agents. *Van Riper v. United States*, 13 F.2d, 961, 967 (2d Cir.) cert. den. 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926) (L. Hand, J.).  See, generally, Weinstein, Federal Evidence, ¶801(d)(2)(E)[01], p. 801-308, et. seq. Judge Weinstein, in his treatise notes that the drafters of the Model Code of Evidence departed from the "in furtherance" requirements as a way to depart from

3

the traditional "agency" theory of the co-conspirator statement exceptions to the hearsay rule.  However, as Judge Weinstein also points out, the drafters of Rule 801 rejected the Model Code and retained the traditional "agency" approach toward the co-conspirator exception.

Primarily, Judge Weinstein notes, it was necessary to preserve the "in furtherance of the conspiracy" requirement as a means necessary to protect the defendants from the real dangers of unfairness posed by conspiracy prosecutions. Weinstein, supra, 801-310.  Judge Weinstein quotes the report of the New Jersey Supreme Court, Committee on Evidence 167 (1963), which stated, among other things:

> The hearsay statements of alleged co-conspirators are perhaps the most suspect of all.  To permit criminal convictions to be based on such evidence would indeed be unfair and impractical.

As Judge Weinstein notes,

> The committee's retention of the 'in furtherance' requirement was motivated by a desire to strike a balance between the great need for conspirators' statements in combating undesirable criminal activity which is inherently secretive and difficult to prove, and the need to protect the accused against idle chatter of criminal partners as well as inadvertently misreported and deliberately fabricated evidence.

4

Weinstein, *supra*, p. 801-311.

Judge Weinstein quotes from *Krulewitch v. United States*, 336 U.S. 440, 443-44, 69 S.Ct. 716, 718, 93 L.Ed. 790, 794 (1949), where the Supreme Court noted:

> This prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by federal court.

Weinstein, supra, p. 801-312. In *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Supreme Court again stated that

> We have consistently refused to broaden that very narrow exception to the traditional hearsay rule which admits statements of a co-defendant made in furtherance of a conspiracy or joint undertaking.

See also, *Dutton v. Evans,* 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213, 222 (1970).[3] Judge Weinstein acknowledges that some court decisions appear to ignore this distinction, but indicates that in many cases in may be attributable to the failure of the attorneys and courts to thoroughly analyze the statements. Weinstein, supra, p. 801-316. Judge Weinstein concludes

---

[3] "It is settled that in federal conspiracy trials the hearsay exception that allows evidence of an out-of-court statement of one conspirator to be admitted against his fellow conspirators applies only if the statement was made in the course of and in furtherance of the conspiracy."

> The adoption of rule 801(d)(2)(E) and the rejection of
> the model code - uniform rule approach should be
> viewed as mandating a construction of the 'in
> furtherance' requirement protective of defendants,
> particularly since the Advisory Committee was
> concerned lest relaxation of this standard lead to the
> admission of less reliable evidence.  Narrative
> declaration should not be admitted as a matter of course
> and statements of confession should be carefully
> scrutinized.

Weinstein, supra, p. 801-316.  *See, United States v. Lang,* 589 F.2d 92, 99-100 (2d

Cir. 1978); *United States v. Smith*, 578 F.2d 1227, 1232 n. 8 (8th Cir. 1978);

*United States v. Moore,* 522 F.2d 1068, 1077, n. 5 (9th Cir. 1975), cert. den. 423

U.S. 1049 96 S.Ct. 775, 46 L.Ed.2d 637 (1976) ("casual admission of culpability"

in no way furthered conspiracy or in any way assisted in achieving the

conspirator's objectives.)

**b. Narratives of Past Events Are Not "In Furtherance Of" Conspiracies.**

As Judge Weinstein's treatise point out, many courts have been careful to

exclude mere narratives as statements "in furtherance of the conspiracy" unless

other clear indications exist that the narrative of past events is necessary to further

the purpose of the conspiracy.  Thus, the recounting by one of the co-defendants of

past events or past conduct on the part of any of the co-conspirators is not in itself

a declaration of furtherance of the conspiracy.  *United States v. Tarantino*, 846

F.2d 1384, 1412 (D.C. Cir. 1988); *United States v. Birnbaum*, 337 F.2d 490, 494-95 (2d Cir. 1964); *United States v. Foster*, 711 F.2d 871, 880 (9th Cir. 1983); *United States v. Eubanks*, 591 F.2d 513, 520 (9th Cir. 1979); *United States v. Wolff*, 839 F.2d 1387, 1395 (10th Cir. 1988); *United States v. Perholtz*, 842 F.2d 243, 356-57 D.C. Cir., cert. den., 109 S.Ct. 65, 102 L.Ed.2d 42 (1988) and ("during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise" statements were not admissible as in further of the conspiracy); *United States v. Badalamenti*, 626 F.Supp. 658, 662 (S.D.N.Y. 1986) ("statement was more like narrative gossip" and was therefore inadmissible); *United States v. Bibbero*, 79 F.2d 581, 583-85 (9th Cir. 1984), cert. den., 471 U.S. 1103, 105 S.Ct. 2330, 85 L.Ed.2d 847 (1985) (mere conversation between conspirators is not admissible); *United States v. Fielding*, 630 F.2d 1357, 1364-66 (9th Cir. 1980) (error to admit narratives of past events, puffing statements made to induce participation in new conspiracy and statements made to get help in collecting money owed; statements were in furtherance of declarant's purpose but not that of the conspiracy); *United States v. Kessler*, 530 F.2d 1246, 1256 n. 16 (5th Cir. 1976) (this declarant was on a "frolic of his own" which did not amount to furtherance of the conspiracy); *United States v. Nazemian*, 948 F.2d 522 (9th Cir. 1991) (while part of statement was intended to facilitate, an

objective, a portion of statement concerning defendant was purely historical and has no connection or purpose related to the conspiracy. The district court finding that statement was in furtherance of conspiracy was clearly erroneous.).

The government's use of the word "communication" obviously includes emails and texts. Since defense counsel is already in possession of these documents, a reference to which "communications" the government believes are in furtherance of the conspiracy can be made known and addressed prior to trial. If the communication is clearly within the scope of the proven by a preponderance of the evidence conspiracy, Mr. Owimrin will have no objection. If the communication includes a portion that is not in furtherance, it can be redacted. Most likely, informing conspirators of the particular roles within a conspiracy will be admissible. However, there is no way to determine whether the communications or a portion of the communications are in the furtherance of the conspiracy including the reason why Mr. Owimrin no longer worked for Arash,

The government should immediate make available to the defendants all communications it intends to offer into evidence under this theory.

## II. Chargebacks and Victim Complaints Recovered From Ketachbi's Residence

The government has argued that these documents, including documents

8

relating to witnesses who will not testify[4], are admissible because it is not offered for the truth of the matter asserted in it but to demonstrate that Ketachbi was aware of allegations of misrepresentation made by members of the conspiracy to the alleged victims.  It is not argued, nor can it be disputed that such evidence cannot and should not be admitted against Mr. Owimrin for any purpose. Thus, the issue for Mr. Owimrin is whether a limiting instruction to the jury that makes it clear that the documents are not to be considered against him can overcome the undue prejudice that admission would cause.  If the undue prejudice cannot be cured by instructions, the government must choose between severance or not offering the documents at trial.

Unfortunately, the  government has provided only a few of the documents it intends to offer though it has made it clear in its papers that it intends to demonstrate the "volume" of customer complaints that allege misrepresentations by the salespeople, one of whom was Mr. Owimrin.  The alleged misrepresentations or complaints range from failure to receive the merchandise purchased within the time indicated in their agreement, promises that the customer would receive a "commission check" within 90 days and a promise that "I would

---

[4] The government has informed counsel that the documents offered will likely incled ones relating to "victims" who will testify and others that will not testify.

be successful and make a lot of money...."  None of the documents submitted by the government indicate the person who is alleged to have made the misrepresentations.

One of the documents is from an investigator of alleged consumer fraud with Passaic County, N.J. Department of Public Safety notifying A 1 Business Consultants, Inc., that explained that "this office investigates cases evidencing fraud, deceit, or misrepresentation, with respect to sales and advertisements for the sale of merchandise between consumer and a merchant." At least this document noted that "[t]his department recognizes that situations such as this arise from differing viewpoints and interpretations of the facts. For this reason we do not prejudge any complaint and would appreciate receiving your version of the matter within the next ten (10) days."

Defendant is presently unaware of the evidence that the government will offer against the defendant at trial.  However, it does appear that the evidence will include testimony of "victims" who will claim that Mr. Owimrin made misrepresentations in order to induce them to purchase products.  Other witnesses may testify to others making misrepresentations. How many witnesses will testify specifically about Mr. Owimrin or about others is unknown.  How many "victim" complaints will be offered by the government for the specific purpose of

10

demonstrating that Ketachbi was aware of allegations of misrepresentation is also unknown. However, to make its point, it is likely that the number of complaints through the admission of documents will far exceed the number of "victims" who will testify.

While the government's submission appears to indicate that salesmen, such as Mr. Owimrin, may have been told that Ketachbi would be the person handling chargebacks, they have made no showing that Mr. Owimrin was aware of the chargebacks and complaints made by "victims."   Will instructions to the jury that the documents are offered not for the truth of the complaints but for Ketachbi's knowledge of the complaints and should not be considered in any way against Mr. Owimrin overcome the prejudicial effects of its admission? Under the circumstances of this case, the answer is a clear NO.

There are limits to the efficacy of limiting instructions, and they were well exceeded in this case.  As the Supreme Court pointed out in *Bruton v. United States*, 391 U.S. 123 (1968), "A jury cannot segregate evidence into separate intellectual boxes."  *Bruton,* 391 U.S. at 131, quoting, *People v. Aranda*, 63 Cal.2d 518, 528-29, 407 P.2d 265, 271-72 (1965) (Traynor, C.J.) (since superseded by statute and state constitutional amendment).

Similarly, Justice Jackson made the oft-quoted observation, "The naive

assumption that prejudicial effects can be overcome by instructions to the jury, all practicing lawyers know to be unmitigated fiction." *Krulewitch v. United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) (internal citations omitted).[5]

As the court explained in *United States v. Figueroa*, 618 F.2d 934, 946 (2d Cir. 1980)

> [i]n assessing the risk to a co-defendant of prejudice created by evidence admitted in a joint trial solely against another defendant, the trial court must balance interests somewhat differently than when it makes this assessment in the trial of one defendant. The trial judge must weigh not only the probative value and the risk of unfair prejudice to the defendant against whom the evidence is offered, but also the appropriateness of permitting the prosecution to introduce the evidence in a joint trial. Evidence that might be admissible under Rule 403 in a trial of one defendant is not inevitably admissible in a joint trial. In some situations the danger of unfair prejudice to co-defendants may be so great that the prosecution must be put to a choice of forgoing either the evidence or the joint trial.

This Court recognized the wisdom of those axioms in

---

[5]     There is extensive literature on the capacity of jurors to follow judges' instructions to disregard prejudicial or inadmissible evidence, and it is unanimous in finding this capacity to be severely limited. See, e.g., K. Pickel, *Inducing Jurors to Disregard Inadmissible Evidence: A Legal Explanation Does Not Help*, 19 LAW & HUMAN BEHAVIOR 407 (1995); A. Reifman, et al., *Real Jurors' Understanding of the Law in Real Cases*, 16 LAW & HUMAN BEHAVIOR 539 (1992); G. Kramer, et al., *Pretrial Publicity, Judicial Remedies, and Jury Bias*, 14 LAW & HUMAN BEHAVIOR 409, 430 (1990) ("Our results are completely consistent with prior research on the ineffectiveness of judicial cautionary instructions. An admonition from the judge to ignore all publicity had no effect on juror or jury verdicts").

*United States v. Jones*, 16 F.3d 487 (2d Cir. 1994),

wherein this Court ruled that when "there is an

overwhelming probability that the jury will be unable to

follow the court's instructions and the evidence is

devastating to the defense … it would be quixotic to

expect the jurors to perform such mental acrobatics

called for by the district judge." *Jones*, 16 F.3d at 493,

citing, *Nash v. United States*, 54 F.2d 1006, 1007 (2d

Cir. 1932) (Hand, J.); see also *United States v. McVeigh*,

169 F.R.D. 362, 364 (D.Colo. 1996) ("The frailties of

human nature require some constraints on the procedures

used to achieve an acceptable outcome.").[6]

...the balancing required by Rule 403 for all evidence would not be needed if a limiting instruction always insured that the jury would consider the evidence only for the purpose for which it was admitted. Giving the instruction may lessen but does not invariably eliminate the risk of prejudice notwithstanding the instruction.")

*Figueroa,* 618 F.2d at 947. *See also, United States v. Gardell*, ___ F. Supp.2d

___, 2001 WL 1135948, at *8 (S.D.N.Y. September 25, 2001) ("[t]he spillover

---

[6]      In *Bruton*, the Supreme Court devoted a long footnote to a catalog of Judge Hand's repeated criticism of limiting instructions.  See *Bruton*, 391 U.S. at 132 n.8.

effect in this . . . scenario may render a limiting instruction ineffective," resulting in either exclusion of the prejudicial evidence or severance of the prejudiced defendants).

If the government insists on the admission of this evidence against Ketachbi, the only remedy is a severance for this evidence would not be admissible at a trial of just Mr. Owimrin. As it presently appears, much of the evidence relating to Ketachbi's alleged participation in the conspiracy is not relevant to the alleged particpation of Andrew Owimrin and vice versa.   Thus, the impact on judicial economy will be limited.

## III.  Andrew Owimrin's Purchase of and Assistance to Co-Conspirators of Obtaining Narcotics

It may be impossible to avoid all testimony of oxycodone use but the government's arguments for the admission of such testimony lack legal support. First, there is no basis for the claim that such evidence is admissible under Rule 404(b) to prove motive in participating in the Telemarketing Scheme and to rebut any claim that he lacked full knowledge or intent to commit the charged crimes. An argument that Mr. Owimrin used drugs and therefore was willing to commit fraud to pay for his drugs is simply another way of arguing propensity.

It is unclear how the narcotics use "is central to the understanding the

relationship of "mutual trust'" among the participants in the alleged conspiracy. Nor is it relevant that in the scheme alleged in the indictment that mutual trust is necessary nor a required part of the scheme.  Further, the testimony that Mr. Owimrin worked for different companies will not be disputed. Nor is it claimed that Arash shielded him because of a relationship to Mr. Owimrin's cousin. It is unlikely that any participant will attribute the character of beneficence to Arash.

The only potential basis for the government to elicit evidence of the use of narcotics and related matters would be to fully understand the dynamics of the companies that Mr. Owimrin worked at.  The necessary testimony to accomplish that would be minimal and the government should be required to proffer the substance of that testimony.

15

## CONCLUSION

For the reasons stated above, the government should not be permitted to offer documents relating to chargebacks and victim complaints recovered from Ketachbi's  residence, must specify what communications that it seeks to admit as co-conspirators statement in the furtherance of the conspiracy, and deny the admission of testimony relating to drugs as to Andrew Owimrin unless and until it can provide a valid basis for its admission.

Respectfully submitted,

/s/

Sam A. Schmidt

Abraham Hassen