J3RVOWIS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         17 CR 243 (SHS)

5    ANDREW OWIMRIN,

6                   Defendant.            SENTENCE

7    ------------------------------x

8                                         New York, N.Y.
                                          March 27, 2019
9                                         6:35 p.m.

10
     Before:
11
                         HON. SIDNEY H. STEIN,
12
                                          District Judge
13

14                            APPEARANCES

15
     GEOFFREY S. BERMAN,
16        United States Attorney for the
          Southern District of New York
17   KIERSTEN A. FLETCHER
     ROBERT B. SOBELMAN
18        Assistant United States Attorneys

19   SAM A. SCHMIDT
     ABRAHAM J. ABEGAZ-HASSEN
20        Attorneys for Defendant

21

22   ALSO PRESENT:  CHRISTOPHER BASTOS, NYPD

23

24

25

                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

J3RVOWIS

```
1              (Case called)
2              MS. FLETCHER:  Good evening, your Honor.
3              Kiersten Fletcher and Robert Sobelman, for the
4    government.  We're joined at counsels' table by Detective
5    Christopher Bastos of the New York City Police Department.
6              THE COURT:  Good evening.
7              MR. SCHMIDT:  Good evening, your Honor.
8              Sam Schmidt and Abraham Hassen for the defendant.
9              Also Samuel Tureff, our paralegal, is also in the
10   audience.
11             We're ready to proceed, your Honor.
12             THE COURT:  All right.  Please be seated.
13             Did you say Mr. Tureff is here?
14             MR. SCHMIDT:  Yes.  He's sitting in the first row,
15   your Honor.
16             THE COURT:  That's above and beyond.  He had his
17   appendix taken out last week.
18             MR. SCHMIDT:  Yes, he did, your Honor.  And it was
19   successful.  So we're glad that he could make it.
20             THE COURT:  All right.
21             And Mr. Hassen, you're a father for the first time.
22   But to sit on the same day, one appendix out, one new kid born.
23             Congratulations.
24             MR. ABEGAZ-HASSEN:  I don't know about the appendix.
25             THE COURT:  No, I understand.
```

J3RVOWIS

1          But I'm congratulating you, sir.

2          MR. ABEGAZ-HASSEN:  Thank you very much, your Honor.

3          THE COURT:  I'm sorry that got lost.

4          Congratulations on being a father for the first time.

5     It has nothing to do with Mr. Tureff's appendix.  I was talking

6     about the coincidence of it being on the same day.  And

7     congratulations.  It's a wonderful adventure.

8          MR. ABEGAZ-HASSEN:  Thank you.

9          I spent the last five nights in the hospital, so my

10    sleep was less than on trial so --

11         MR. SCHMIDT:  But I have received a full night's

12    sleep, so I'm ready to go, your Honor.

13         MS. FLETCHER:  We all know that's important to Mr.

14    Schmidt.

15         THE COURT: Yes.  Let's proceed, everybody.

16         Let me tell you what I have.

17         I have the presentence report revised on February 27

18    of this year, which has a guideline range of 87 to 108 months.

19    I have two letters dated March 12 -- one is document 389, the

20    other is document 390 -- from Mr. Schmidt.  And for all the

21    relevant defendants, I have, as I said earlier today, the March

22    13 letter of the government, document 391, and the March 20

23    letter from the government.

24         Is there any additional written information I should

25    have, Mr. Schmidt?

J3RVOWIS

1          MR. SCHMIDT:  Yes, your Honor.  You should have a

2   submission by me from March 24th.

3          THE COURT:  I do.  Here it is.  It's document 418.

4          Anything else?

5          MR. SCHMIDT:  I believe that's it, your Honor.

6          THE COURT:  Government, anything else I should have?

7          MS. FLETCHER:  No, your Honor.

8          THE COURT:  Mr. Schmidt, have you read and discussed

9   all this information with your client?  And you've also seen

10  the victim impact statements; correct?

11         MR. SCHMIDT:  Yes, your Honor.  I saw the large group

12  of victim impact statements a few months ago; I received them

13  from another counsel.  And earlier today I saw the two March --

14  later March submissions.

15         THE COURT:  Have you read and discussed all this with

16  your client?

17         MR. SCHMIDT:  I've read all that's necessary relating

18  to almost all of the letters.

19         THE COURT:  Do you want more time to discuss these

20  matters with your client?  I want to make sure you've had a

21  full opportunity -- and taken advantage of that opportunity --

22  to review the written submissions.  I take it you have.

23         MR. SCHMIDT:  I have, your Honor.  I do not require

24  any additional time.

25         THE COURT:  All right.

J3RVOWIS

1          Mr. Schmidt, do you have objections to the findings of

2     fact in the presentence report?

3          MR. SCHMIDT:  Your Honor, the only objection that we

4     have is the role in the offense.  As stated in our March 12th

5     submission and in the reply, the March 24 submission, we

6     believe that Mr. Owimrin should be considered a minor

7     participant.

8          THE COURT:  Show me where that is.  Are you asking

9     for -- you're not asking for four points down, you're asking

10    for three, I gather?

11         MR. SCHMIDT:  Your Honor, I think that we did not set

12    a number, so -- but I think more realistically a two-point

13    reduction would be the most appropriate number.

14         THE COURT:  Where in your submission is this argument?

15         MR. SCHMIDT:  In my March 24th, your Honor -- excuse

16    me, my March 12th --

17         THE COURT:  It's on page 14.

18         MR. SCHMIDT:  Almost there.

19         THE COURT:  Under 3B1.2.

20         MR. SCHMIDT:  That is correct, your Honor.

21         Your Honor, to some extent, our position with role in

22    the offense is a concurrent argument with the relative

23    culpability of Mr. Owimrin with the other defendants charged in

24    this case.  And we do comment on the government's letter of

25    March 13th in our March 24th letter where the government sets

J3RVOWIS

1    these so-called tiers.  And we further discuss how Mr. Owimrin

2    should not be in the same tier as Mr. Kavner, Mr. Quirk,

3    Mr. Medeiros, or Ms. Marcus.

4          THE COURT:  I'm not concerned about the tiers.  That's

5    the government's view.  If your argument is that he's less

6    culpable than the government thinks he is, is that what you're

7    telling me?  You can argue that.  You can tell me about that.

8          MR. SCHMIDT:  Yes, your Honor.

9          THE COURT:  I don't care about the tiers.

10         What I'm talking about now is the guideline

11   calculation.

12         MR. SCHMIDT:  I think, your Honor, factually --

13         THE COURT:  You seem to be asking -- although it's a

14   little hard -- for a mitigating role under 3B1.2.

15         MR. SCHMIDT:  That is correct.  That is correct.

16         Your Honor, I don't think we actually have a factual

17   dispute between us and the government as to Mr. Owimrin's role.

18   What I think the dispute is, that the government does not

19   consider that role a minor role as per the guidelines.  And we

20   believe that it is a minor role as per the guidelines.

21         As I set forth in my submissions, other than

22   Mr. O'Reilly -- which I will not consider because of the fact

23   he did not plead guilty to the same offense, he just pled

24   guilty to the obstruction count -- and as to Mr. Ketabchi --

25   whose role was so obviously, both time-wise and geographically,

J3RVOWIS

1    separate from my client -- that everyone else charged in this

2    indictment and related indictments appear to have a

3    principal -- an ownership of businesses that are related to the

4    industry.

5            THE COURT:  No, he wasn't an owner, but he clearly --

6    I don't mean to cut you off, sir.  He wasn't an owner, but he

7    clearly didn't have -- he wasn't a minor participant; he was

8    very active in terms of selling.  In fact, he was aggressive

9    under the urging of Arash Ketabchi.

10           MR. SCHMIDT:  Well, actually, your Honor, he has never

11   been described as aggressive.  Neither Mr. Finocchiaro nor

12   Mr. Sinclair described him as aggressive.  So, no, he was not

13   aggressive.

14           THE COURT:  Well, those two gentlemen would have

15   thought that aggressive is a good thing; they wanted their

16   salesmen to make sales.

17           MR. SCHMIDT:  No, I understand that.  But I asked

18   those questions to both Mr. Sinclair and Mr. Finocchiaro about

19   who are the aggressive persons, they answered who were the

20   aggressive persons.  And when I asked them if they considered

21   Andrew aggressive, they said no.

22           THE COURT:  All right.  Fair enough.

23           MR. SCHMIDT:  That's one of the issues.

24           Now, what happened in 2015 was that the Sentencing

25   Commission tried to --

J3RVOWIS

1          THE COURT:  Sir, I'm trying to do this in an orderly

2     fashion.

3          MR. SCHMIDT:  Sure.

4          THE COURT:  What you're arguing now is the guideline

5     calculation.  I'm asking whether you have any objections to the

6     findings of fact.

7          So is there a finding of fact in that PSR that you

8     want to object to?

9          MR. SCHMIDT:  Your Honor, I think that there was --

10         THE COURT:  I'm not talking about the guideline

11     calculation.

12         MR. SCHMIDT:  I think there was one fact, I think,

13     that they put my client's name that made it appear like he

14     was --

15         THE COURT:  Just find the paragraph.

16         MR. SCHMIDT:  It's on page 13, your Honor, of the

17     March 12th submission.

18         THE COURT:  No, no.  Look at the presentence report.

19         MR. SCHMIDT:  Paragraph 16 of the PSR.

20         THE COURT:  What's your objection?

21         MR. SCHMIDT:  Andrew Owimrin did not operate.  He was

22     a salesman.

23         MS. FLETCHER:  Fine, your Honor.  An Andrew Owimrin

24     can be removed from paragraph 16.

25         THE COURT:  Done.

J3RVOWIS

1           MR. SCHMIDT:  16.  16.

2           THE COURT:  16.  Paragraph 16.  I am deleting Andrew

3   Owimrin from paragraph 16.

4           Anything else?

5           MR. SCHMIDT:  No other factual --

6           THE COURT:  Government, any objections to the findings

7   of fact?

8           MS. FLETCHER:  No, no objections to the findings of

9   fact, your Honor.

10          But point of clarification.  I understand the Court to

11  be deleting Andrew Owimrin from the paragraph of 16, but not

12  from the chart that follows within the same paragraph.

13          THE COURT:  Yes, that's correct.

14          MS. FLETCHER:  Agreed.

15          THE COURT:  All right.

16          I adopt the findings of fact, except to the extent of

17  in paragraph 16, not the chart, the paragraph itself --

18          MR. SCHMIDT:  Your Honor --

19          THE COURT:  -- I'm deleting Andrew Owimrin.

20          MR. SCHMIDT:  Your Honor, there's actually -- I just

21  noticed one thing.  It doesn't require really for it to modify

22  the PSR, because it's not about my client.  But under the

23  Vanguard Business Solutions, they only list Joseph McGowan and

24  Jack Kavner.  And as I set forth in my submissions, that

25  Mr. Diquarto and Mr. Quirk were also owners in business, so

J3RVOWIS

```
1    while I don't need their names to be inserted in there, it is

2    part of my submission.

3            THE COURT:  All right.  I hear what you say.

4            I adopt the findings of fact in the presentence

5    report.

6            Tell me what you want me to know, sir.  And you know

7    obviously that I presided over the trial.  You know because

8    I've told you I've read all of this information.  So go ahead.

9    You know also that it's late, but I'm here to give you whatever

10   time the parties want.  This is an important issue, obviously.

11           MR. SCHMIDT:  Your Honor, the two issues involving the

12   guidelines are our position that Mr. Owimrin should have a

13   minor role, and I believe the government's position that

14   obstruction of justice is appropriate.  And so before I get

15   into my overall picture -- actually, take it back.  That's part

16   of the overall picture that I set forth in both of my

17   submissions.  And role of the offense is also important, and

18   perhaps even more important than role in the offense with the

19   guidelines, because the guidelines really help your Honor with

20   a determination of the appropriate sentence.  However, it

21   shouldn't be anchored with the guidelines.  And I think the

22   Court of Appeals has indicated that it's not really a starting

23   point, it's just one of the points to consider.

24           THE COURT:  No, I think the cases say it's the

25   starting point in the analysis.  I determine what the
```

J3RVOWIS

appropriate guideline range is, but it's not entitled any

presumptions.

MR. SCHMIDT:  As I set forth in my submissions, every

single other person, other than Mr. Ketabchi and

Mr. O'Reilly -- I'm going to ignore them for now so I don't

have to keep on making exceptions to them.  Every other person

had been a long-term -- had long-term involvement in

telemarketing fraud at some company or the other; most of them

at The Tax Club, some of them even before that, at Educational

Direct, and some of them in different companies.

Every single one of them, except for perhaps

Mr. Medeiros, were a principal in some company that was

involved in telemarketing; they were owners or part-owners of

some company was involved in it.  All of them knew the industry

from top to bottom, from all of the participants, everything

that was needed to run these marketing companies.  All of them

knew that except for the one person who was indicted, who was

merely a salesman.  Yes, we are not arguing that some of the

things that he did were terrible.  Your Honor understands that.

But he was this important, but small part.

And one of the things that the 2015 amendment to the

guidelines discuss are the things that specifically say even

though somebody was an absolute necessary or essential part of

the conspiracy, that does not mean he should not receive a

minor role adjustment.  That's on page 14 of my submission from

J3RVOWIS

March 12.

And it sets forth not a total, but a good number of examples of what makes somebody receive a role enhancement. And Mr. Owimrin fits in every single category of what makes somebody eligible for a role enhancement. And every single person except for Mr. Medeiros, who may not own the company, but brought in Youngevity and, sort of, ran in Youngevity, all principals who -- but all of them knew and were benefiting in some other way for every single one of those points. Completely different than Mr. Owimrin.

It recognizes that Mr. Owimrin, in some of the documents that we saw during trial and one of the documents that we submitted, was one of many salespeople. And, in fact, in one of the documents I showed was one of the lower-performing ones, who made almost exactly the same as Reagan Owimrin did during that same period of time, which was either, percentage-wise, 20 percent, 30 percent, or 40 percent of what some of these other people have made. So he even wasn't a big performing one.

And remember, he's charged not just in a little bit, he's charged in that whole conspiracy starting in 2013 and ending in 2016.

So in his role, he had none of the discretion, always had to have the permission of somebody to do anything other than sell what he was told he could sell. I'm not talking

J3RVOWIS

1   about what ultimately the guidelines should be, but just the

2   role that he had in this whole thing was one of the least of

3   the people charged in this conspiracy.

4          And as an analogy, I use that his role was less than

5   many of the people who the government decided, for whatever the

6   reason -- and they have the right to do so -- not to charge.

7          So I think that the guidelines should be reduced by

8   two levels to bring it down to whatever the numbers would be.

9          THE COURT:  That's your minor role adjustment under

10  3B1.2; correct?

11         MR. SCHMIDT:  That is correct.

12         THE COURT:  All right.

13         MR. SCHMIDT:  Now, would you like me to continue or do

14  you want the government to discuss --

15         THE COURT:  Let's deal with the minor role adjustment.

16  I'm not inclined to give it, as I understand the application,

17  which makes him substantially less culpable than the average

18  participant in the criminal activity.

19         He was the core of the criminal activity.  He wasn't

20  Sinclair, he wasn't Finocchiaro, he wasn't Arash.  But the

21  salesmen are the workhorses of this operation.  He was not,

22  therefore, in the instant, which is the implication of your

23  remarks.  As a salesman, he's not substantially less culpable

24  than the average participant --

25         MR. SCHMIDT:  Your Honor --

J3RVOWIS

 1          THE COURT:  -- in the activity.  That's my

 2   inclination.  Let me hear from the government.

 3          MR. SCHMIDT:  We're talking about the average

 4   participant charged, not the average participant, counting

 5   everybody who hasn't been charged or hasn't even committed a

 6   crime.  And the people --

 7          THE COURT:  I think my statement stands for whether

 8   it's the average participant in your average telemarketing

 9   scheme, or whether it's the average participant in this

10   telemarketing scheme, or whether it's the average participant

11   charged in this telemarketing scheme.  Under any of those

12   rubrics, he is not substantially less culpable.

13          But I don't want to prejudge it.  I heard what you

14   said.  Let me hear from the government.

15          MS. FLETCHER:  I think your Honor has it exactly

16   right.

17          Andrew Owimrin in this case is the quintessentially

18   average participant in this scheme.  He is not a minor

19   participant.  There are plenty of salespeople who had a far

20   less significant role than he did.  There are also employees

21   employed at the telemarketing floors who were not salespeople

22   at all, whose role was significantly less.

23          For example, there were, as your Honor heard at trial,

24   the appointment setters, so the people who would call the

25   customers and set up appointments for them to get on the phone

J3RVOWIS

with salespeople.  Those individuals are participants in the criminal activity, but they are not average participants; they are below average.

What's happened in this case is that the government, in its discretion, did not charge individuals who were below average with federal crimes here.  We chose to charge only those individuals who were average members of the conspiracy or above them.  And Andrew Owimrin falls within that.

Just looking at the fact-based determination that the guideline calls for, he understood the scope and structure of the criminal activity, the acts that he performed in his responsibility and discretion.  In getting on the phone with a salesperson, he is -- I'm sorry.  In getting on the phone as a salesperson, he is master of the sales call.  Yes, he took direction from others; but he has decision-making authority about what to say on the call and is not just being asked to perform certain tasks.

He also has a pecuniary interest in the criminal activity.  He receives commissions for the sales that he makes; he's not just paid for performing tasks.

And so as the guideline makes clear and as, I think, trial proof makes clear, as well, he is an average participant; he is not entitled to a minor role adjustment.

THE COURT:  All right.

MR. SCHMIDT:  Your Honor, very briefly.

J3RVOWIS

1          THE COURT:  Yes.

2          MR. SCHMIDT:  One, he did not have the discretion.  As

3     you heard in the testimony, he was supposed to follow the

4     script.  That's not having discretion.  If he's going to go

5     anywhere off of the script, he needed permission.  So he did

6     not have discretion.

7          Scope and structure --

8          THE COURT:  Well, he certainly wasn't an operator of

9     the businesses or an owner, that's for sure.

10          MR. SCHMIDT:  The scope and structure of the criminal

11     activity, you heard how complex the structure was.  Mr. Owimrin

12     had an idea of what he was supposed to do.  He got leads, he

13     took the leads, he made the phone calls, then he gave it over

14     to the next person on the line.  And then what happened there,

15     he rarely dealt with fulfillment at all.  He knew it existed,

16     but he didn't know the scope of this kind of activity and how

17     they got the leads.

18          And it's not that he had pecuniary interest in it,

19     it's the degree of the pecuniary interest.  He got a percentage

20     of his sales, period.  The pecuniary interest of somebody who

21     is getting more than that would make the difference.

22          So I understand, your Honor.  I think that clearly he

23     was an essential part of the enterprise.  But if you look at

24     the numbers of what people sold -- you had Chris Wilson selling

25     more, you had Diquarto selling more, you had everybody else

J3RVOWIS

1    other than Reagan, who sold about the same amount as our

2    client -- there is no way that in the enterprise he is more

3    than any salesman could possibly be.

4              He was involved obviously --

5              THE COURT:  What do you do with the government's point

6    about all of the appointment setters?  They were described

7    differently as either secretaries or appointment setters; all

8    the calls went through them and then they assigned them to the

9    salesperson.  The government is arguing there were a number of

10   those, and there were.

11             MR. SCHMIDT:  One, they were not charged, your Honor,

12   in the instant indictment.  So in the instant indictment --

13             THE COURT:  Well, I don't know where you get the

14   requirement of the instant indictment.  It says "in the

15   criminal activity."  3A says "average participant in the

16   criminal activity."

17             MR. SCHMIDT:  Your Honor --

18             THE COURT:  All right.  Let's move on.

19             I understand the argument.

20             I am not finding that he is substantially less

21   culpable than the average participant in the criminal activity;

22   and he's not entitled to a mitigating role adjustment under

23   3B1.2(a) or (b).

24             All right.  Let's move on.

25             What else?

J3RVOWIS

1          MR. SCHMIDT:  I think the next issue within the

2     guidelines would be the government's position on obstruction.

3          THE COURT:  The perjury enhancement, two points.

4          Government, do you want to make it, the argument?

5          Are you still seeking it?

6          MS. FLETCHER:  We are, your Honor.

7          And the reasons for the argument are set forth at page

8     7 and on to 8 of our submission.

9          Your Honor, we identified in our submission a number

10    of specific instances that Andrew Owimrin lied about during his

11    testimony.  It was not something that was subject to confusion

12    or mistake; it was a specific, elaborate explanation for some

13    of the most damning evidence against him, in particular, about

14    the meaning of the Charlene Foster recording, the statements

15    that he made about who actually sold Jane Thompson the $150,000

16    equity investment in A-1 business.

17          There were a number of examples.  And so for the

18    reasons set forth in our submission, the obstruction, the two

19    points for obstruction should apply to Mr. Owimrin.

20          THE COURT:  All right.  Thank you.

21          MR. SCHMIDT:  Your Honor?

22          THE COURT:  Yes.

23          MR. SCHMIDT:  If you see my reply submission, starting

24    on page 7, the government is wrong.  This is not an issue of --

25    this is a factual issue that they are making that they are

J3RVOWIS

1      wrong.

2              For example, Ms. Foster, this was not a telephone

3      conversation about just charging somebody's charge card because

4      they could do it.  They sold the products that they charged

5      for.  Now, it's part of the fraud, I understand that, but this

6      wasn't just a charge out of nothing; this was a charge -- she

7      signed the agreement.  She sent it back to A-1.  And I provide

8      it on Exhibit E, the signed contract by her and the first page,

9      which were the things that were sold to her.

10             In fact, what was done was Mr. Ketabchi did not want

11     to have $20,000 on one card.  So as you can see from the

12     exhibits, there were $14,999 on one card, and $5,000 on the

13     other card.  So this is not just a makeup charge; this is for

14     the product sold.

15             And more telling than that, your Honor, is both

16     Ms. Foster, in her deposition, and Mr. Owimrin ended up getting

17     it wrong.  They both made a mistake in their testimony.

18             Mr. Owimrin testified that besides the Bizop product,

19     he sold Youngevity to her, because he heard her testify that

20     she just had to go out and get the checks from the mailbox.  In

21     fact, he did not sell Youngevity.  I have both indicated it in

22     here and in one of the records that we attached in the original

23     submission indicate that she was not a person who bought

24     Youngevity.  And that --

25             THE COURT:  All right.  Let me just render a decision

J3RVOWIS

1    here.

2            I'm not giving him two points up under 3C1.1, that

3    the -- I have to find a willful impediment to or obstruction of

4    justice or an attempt to do so.  And I'm not finding that in

5    this case.

6            I have to find that it's a witness who gives false

7    testimony concerning a material matter, with the willful intent

8    to provide false testimony, before applying an obstruction

9    enhancement based on perjury.

10           I have to find by a preponderance that the defendant

11   willfully and materially committed perjury, which is the

12   intentional giving of false testimony as to a material matter;

13   that is, that Owimrin consciously acted with the purpose of

14   obstructing justice.  That's *United States v. Thompson,* that's

15   *United States v. Galan*, *United States v. Pena, United States v.*

16   *Agudelo*.  There's another major one, *United States v. Dunnigan*.

17           I'm not giving two points for obstruction.

18           That's, I think, the only issues on the guideline

19   calculations.

20           MR. SCHMIDT:  That is correct, your Honor.

21           THE COURT:  All right.

22           I'm adopting the findings of fact in the presentence

23   report.

24           Tell me what you want, sir, that you haven't told me

25   already either in your writing or in your presentation today.

J3RVOWIS

1            There's no question that he was an active salesperson

2    here.  He was important.  Whether he was successful or not is a

3    separate question.  He's important to the operation.

4            Was he following directions of Arash?  Yes.  But he

5    still was defrauding people.  And he knew what he was doing.

6    He should have taken the auxiliary policeman job, but he

7    didn't.  He knew he was selling a scam.

8            MR. SCHMIDT:  Your Honor, there is no dispute, I

9    believe, because the government actually writes in their

10   submission, in asking for a higher-than-guideline sentence for

11   Arash Ketabchi, that Andrew Owimrin was one of the two people

12   brought in who had no record, had no knowledge of the industry,

13   obviously, therefore, did not know what was --

14           THE COURT:  You're right.  He had no record, you're

15   absolutely right.  And he didn't operate any of the businesses.

16   He had absolutely no criminal history.

17           His mother's letter says that codefendants took

18   advantage of him because he was a drug addict.  They probably

19   did.  That doesn't really change what he did.

20           MR. SCHMIDT:  It doesn't change, your Honor.  And

21   we're not asking for a lower sentence because it changes it.

22   But what it does do is put Andrew Owimrin in a completely

23   different category than every other person in this case.  And I

24   mean every other person.

25           THE COURT:  Everybody is an individual.  My job is to

J3RVOWIS

1   distinguish between the individuals.  Everybody has separate

2   circumstances.

3               MR. SCHMIDT:  I understand that.

4               THE COURT:  He's a great uncle.  He's got lots of

5   letters here.  Lots of cousins weighing in that he's a fine

6   person.  I'm sure he is, but he committed a serious crime.

7               MR. SCHMIDT:  That's not my point, your Honor.

8               My point is you have a young man who've never done

9   wrong, who's done everything he's supposed to.  And he's

10  brought into this industry and taught by masters, by Mr. Slick

11  himself, right, and Mr. Ketabchi to do these things.

12              And there's a couple of very important points.

13              First, when somebody enters into a criminal enterprise

14  knowing it's a criminal enterprise, that says something about

15  the person.  And that should be considered.

16              When somebody enters into a criminal --

17              THE COURT:  He knew it pretty quickly, right?

18              MR. SCHMIDT:  Well, no, no, Judge, our position is not

19  that.

20              THE COURT:  He couldn't get out once he realized what

21  he was in for?

22              MR. SCHMIDT:  No, you're jumping ahead of me, your

23  Honor.  But there is a difference.

24              When somebody enters into a known criminal enterprise,

25  they say something about their morals, their belief, what kind

1    of person they are.

2            When somebody is in what they originally thought was

3    to be a legitimate business -- and both Mr. Finocchiaro and

4    Mr. Sinclair kept on talking about or answered my question,

5    they tried to stay in the gray area, they tried to give the

6    salesmen the right thing to do, and this is just supposed to do

7    the right thing, all right.  They didn't tell the salesmen who

8    weren't involved in the industry ever before that the right

9    thing still might be illegal.  They didn't say that.

10           So yes, Andrew testified.  And he testified in a

11   manner that really walks the line of admitting conscious

12   avoidance.  And I understand that.  But he heard other people

13   doing it wrong, and they got punished.

14           So there's a difference between somebody who goes into

15   this criminal scheme as an innocent unknowingly, right, and

16   then learns that there's something wrong, like his brother

17   mentioned to him and says, This sounds, you know, pretty

18   scummy, maybe you should get out, and stays in it.  There's a

19   difference.  It's a different person, a person who would not

20   have gone in to this business if he was told what this business

21   was really like.

22           THE COURT:  I'm having trouble with that argument.

23           Let me tell you what I think your argument is.  And if

24   I'm right, then I disagree with you.

25           I think your argument is he didn't realize it was a

J3RVOWIS

1    scam when he went in.  And once he learned it was a scam and

2    didn't get out, that's different than somebody who knew it was

3    a scam from the beginning and didn't get out.

4            Is that what your argument is?

5            MR. SCHMIDT:  Almost.

6            My argument is that there were things that were

7    occurring that should have caused him to look at it differently

8    than he looked at it when he entered into there.

9            Now, the problem that occurred, your Honor, at that

10   point was that he started using Oxycodone.  He started using

11   Oxycodone and was fed the Oxycodone by his bosses.

12           THE COURT:  Right.  They took advantage of him.

13   Correct.

14           MR. SCHMIDT:  And by that time, your Honor -- and

15   notice that I mentioned in my submission that even when

16   Mr. Finocchiaro talked to the government, he said something

17   that Mr. Owimrin, he was good for a while, right?  And I think

18   that meant that he was, like, doing everything that he was

19   supposed to.  And then he became more under the influence of

20   Mr. Ketabchi and other -- and drug-using and bad people like

21   Wilson and Diquarto and others, and his judgment was skewered.

22           That's not an excuse; that's an explanation why a good

23   person like Andrew Owimrin, who was a good person, right, did

24   not make the right decisions in walking away when things

25   started looking not so good.

J3RVOWIS

1          But that means --

2          THE COURT:  He didn't get out when he realized he was

3     committing crimes day in and day out, that's what you're

4     telling me.

5          MR. SCHMIDT:  He didn't get out when he should have,

6     when he knew what was happening in the place that he was

7     working was wrong.

8          THE COURT:  Does he have any sense of the devastation

9     he's wreaked on totally unsuspecting, innocent people?

10         MR. SCHMIDT:  Absolutely.  He has that.

11         But he did not have that certainly in the first year,

12    because he had so little contact with chargebacks, with the

13    complaints.  He dealt with a few of them --

14         THE COURT:  He dealt with chargebacks.  He tried to

15    save accounts.

16         MR. SCHMIDT:  Sometimes he did.  But you also heard

17    Ms. LaMorte.  Ms. LaMorte testified she spoke to him.  She said

18    she wanted out; she wasn't happy with it.  And he didn't try to

19    talk her out of it, because that's who he is.  Ms. LaMorte

20    talked about how Andrew was doing things the right way.

21         So he wasn't doing wrong things all the time.

22         And I think the best example, Judge, of what ended up

23    happening, the worst thing was Ms. Thompson.  It's clear.  It's

24    $200,000.  But first Ms. Thompson -- first of all, Brooke

25    Marcus already squeezed Ms. Thompson for $80,000 before she

J3RVOWIS

1    introduced him to Arash and his company.

2              THE COURT:  If I remember, Marcus thought he wasn't --

3    his pitch wasn't good enough, so she was going to help him with

4    his pitch, right?

5              MR. SCHMIDT:  And she was the one who was -- and

6    she -- if not for her, Ms. Thompson would not have purchased

7    the stuff that Andrew was selling, partly because, yes, he did

8    sell the Bizop stuff that he was familiar.  That was the first

9    sale for, I believe, $20,000.  All the other sales were these

10   merchant accounts, either the machines or merchant account,

11   some scheme, right, that he knew nothing about at the time

12   because he never sold anything like that.  So that was

13   orchestrated by Brooke Marcus, not even by Arash Ketabchi, but

14   by Brooke Marcus.  Brooke Marcus is the one that used Andrew as

15   another party, because she didn't want to go back to her lead,

16   to make the sales.

17             THE COURT:  So he's not a free agent is the argument.

18             MR. SCHMIDT:  No --

19             THE COURT:  When he was convincing people to buy this

20   nonexistent product, and when he was trying to save the sale

21   from chargebacks, he is totally innocent?

22             MR. SCHMIDT:  Judge, the testimony about the defendant

23   dealing with chargebacks was on a few occasions when he was

24   with Sinclair and Finocchiaro.  There are a few occasions --

25             THE COURT:  Pretty damning, right?  Pretty damning.

J3RVOWIS

1     It all builds up.

2                MR. SCHMIDT:  Well, I understand.  But do you know

3     what we have?  We have one example of somebody trying to get

4     out of a contract that we've heard the person testify.  And

5     this is how persuasive Andrew was to convince Ms. LaMorte not

6     to cancel.  He didn't.  She wanted to cancel.  He said, Okay,

7     and.  He was nice about it.  And he didn't try to make her

8     uncancel the order.

9                So we're talking about somebody who was magnitudes

10    different, magnitudes different, than the other people in this

11    case.  Magnitudes different than Wilson, magnitudes different

12    from Diquarto, magnitudes different from McGowan, magnitudes

13    different from Medeiros, magnitudes different from Ketabchi and

14    all of the other people there.  Magnitudes, Judge, not just a

15    little different.

16               THE COURT:  Well, I said earlier I didn't care what

17    the government's tiers were, and really T-I-E-R-S.  But they do

18    have -- I was surprised to see they have Owimrin on the bottom

19    of Tier 3, so I'll want the government to talk about that.  I

20    actually see him as higher than that.

21               Go ahead.

22               MR. SCHMIDT:  I think it's alphabetical, your Honor.

23    And the people in Tier 3 --

24               THE COURT:  Oh, I didn't realize that.

25               MR. SCHMIDT:  I didn't realize that at first also.

J3RVOWIS

1        THE COURT:  Each tier is alphabetical?

2        MR. SCHMIDT:  No, not each tier.  It looks like Tier 3

3    is, unless it's by accident.  Oh, it's nots alphabetical.  I'm

4    wrong.

5        MS. FLETCHER:  It's not alphabetical, your Honor.

6        THE COURT:  It's your view of relative culpability.

7        MS. FLETCHER:  Within tier, yes, your Honor.

8        THE COURT:  Even within each tier; correct?

9        MS. FLETCHER:  Yes, your Honor.

10       THE COURT:  All right.  So I'm correct.

11       Go ahead.

12       MR. SCHMIDT:  So that's even better for me.

13       I appreciate it.

14       But the people in the same tier --

15       THE COURT:  But I don't see him that way.

16       MR. SCHMIDT:  Here's the problem, Judge:  I read

17    through the 3500 material of all those other people since the

18    trial is over, who did not testify, right.  And you have Jack

19    Kavner, who owned a part of one of the companies.  The

20    government called him the COO of two companies.  He ran it; he

21    was a -- he was a drug dealer, he started in Educational

22    Direct.  So he's been involved in these schemes since college

23    or just after college, the same thing as Quirk.

24       You're comparing Andrew Owimrin and you're saying he's

25    more because he's a salesman.  All these people are more than

J3RVOWIS

1    salesmen.

2           He was involved, in what we heard here, Ms. Thompson,

3    the worst thing that the government has presented.  I

4    understand that.  But he was simply following what Brooke

5    Marcus told him how to sell, what Bill Sinclair told him how to

6    sell, what Arash Ketabchi told him how to tell.  And he's, as I

7    said, magnitudes different because he is the only one that came

8    into this, of the people charged, who wasn't a criminal to

9    start with.  He wasn't a criminal.  All these other people were

10   criminals.

11          THE COURT:  He came out as a criminal; he's now a

12   federal felon.  And my job is to determine what sentence is

13   appropriate.

14          MR. SCHMIDT:  That's correct, your Honor.

15          And you have to take the individual, right.  And the

16   elements are, yes, the crime that the person has committed, I

17   understand that.  But you also have to take the individual --

18   and I said it in this, that this is the first time that I

19   really have ever addressed a court in saying that my client got

20   into trouble because he was brought into trouble by other

21   people.

22          I tell people who write letters, my clients, and I

23   remind myself, don't do that, because it makes it sound like

24   he's not accepting responsibility for what he did.  But in this

25   case, that's not the issue.  In this case, it is exactly what

J3RVOWIS

1    happened.  You had a good, honest, not terribly educated young

2    man who was a wonderful, decent person to everyone around him,

3    brought into and put into this -- the word I'm looking for, den

4    of thieves, hive of snakes and whatever.

5            THE COURT:  Nest of vipers.

6            MR. SCHMIDT:  Nest of vipers, thank you, your Honor.

7    Brought into this nest of vipers.

8            And when you have somebody who is like him, right,

9    this young man who has no business experience, who really did

10   not have a full childhood because he was working -- he left

11   school at 15, but was even working before then, and you put him

12   in with this den of thieves, a slick den of thieves, a slick

13   nest of vipers, like Sinclair, who can convince anybody of this

14   is wonderful, and he came like them in a much less magnitude

15   way.

16           And yes, he has a sweet voice and this nice voice that

17   made him a good salesman.  But he was not as good as the other

18   people who were more aggressive, who were more nasty, who had

19   more chargebacks.  He was magnitudes different than them,

20   Judge.  And I don't want to -- I do want to keep on repeating

21   myself, because it's every other person here, and even the

22   people in Tier 3 with Mr. Owimrin were so much more important.

23           And even in Tier 4, Mr. Quiles, your Honor, while he

24   didn't make the phone calls, then he did work for Sinclair and

25   Finocchiaro and made phone calls for them before he found it

1    more lucrative to go into "fulfillment."

2              THE COURT:  Why don't you finish up, sir.

3              MR. SCHMIDT:  And he made millions more dollars than

4    my client.

5              So my client really should be at the bottom, and not

6    just at the bottom, but magnitudes different than the people

7    above him.

8              THE COURT:  All right.  Thank you.

9              Government.

10             MS. FLETCHER:  Thank you, your Honor.

11             THE COURT:  Be as succinct as you can.

12             MS. FLETCHER:  I will, your Honor.

13             Just a couple of points that I want to be sure that I

14   touch on.

15             One of the things that makes Andrew Owimrin different

16   than everyone else in this case, except for Shahram Ketabchi,

17   is he absolutely had no experience in the telemarketing

18   industry; he absolutely was lulled into this by other people;

19   he absolutely had a serious drug addiction.  He may, in many

20   ways, be a good person.

21             But even today, even after listening to Jane Thompson

22   testify at trial, even after listening to the other victims in

23   this case, he still has not accepted responsibility.

24             I take the Court's ruling with respect to the

25   obstruction enhancement, but he absolutely lied during his

J3RVOWIS

testimony.  And he was convincing.  He lied with a smile on his

face.  He lied in a sweet way.  He wasn't like Arash, he wasn't

a railroader.

Mr. Schmidt is very familiar with the 3500 material,

so he knows that in interviewing Brooke Marcus, the government

learned that one of the reasons he was selected to speak to

Jane Thompson is because he's a charmer.  He wasn't going to

railroad her, because railroading wouldn't have worked on her.

She needed someone sweet.

And so as your Honor saw with his text messages with

her, he texted her things like, I'm thinking about you, Jane,

and praying for you.  He talked to her with a smile on his face

while he took her money.

And as disgusted as he may have become with what Arash

was doing -- and I take the point that he did, at some point,

leave Arash -- when he went to work for Bill Sinclair, it was

him who suggested selling Jane Thompson debt relief.  He still,

I think, even today, based on the arguments by his counsel,

does not appreciate the gravity and the seriousness of his

conduct.  And he continues to blame others for it.

With respect to Jo Anne LaMorte, five seconds on Jo

Anne LaMorte.

Jo Anne LaMorte realized within three days that her

contract didn't say the lies that Andrew Owimrin told her.

This was at a time when Bill Sinclair was making salespeople

1    pay for all of their chargebacks.

2              The government's view of Andrew's decision to let her

3    cancel is not that he was a nice guy; it's that it wasn't worth

4    the risk.  By that point, if he had tried to keep her on board

5    and she charged back, not only would he have lost his 20

6    percent commission, which was pretty insignificant, but he

7    would have owed Bill Sinclair the full amount of the sale.  A

8    customer like Jo Anne LaMorte, who figured it out in three

9    days, is not worth the trouble for him, and that's why he was

10   nice to her and he just let it go.

11             With respect to the 3500 material, your Honor has seen

12   the submissions on this point.  A lot of the 3500 material that

13   Mr. Schmidt has is because people came in and proffered and

14   told us about all of their conduct that we otherwise would not

15   have had any reason to know.  And that's not to in any way

16   impugn Andrew Owimrin for not doing that or suggest that he was

17   in some way obligated to waive his Fifth Amendment rights; it's

18   only to point out that basis for comparison is somewhat unfair.

19   It holds people accountable for things that they admitted to us

20   in accepting responsibility, to the benefit of someone who

21   still hasn't.  And so it's of limited weight, in the

22   government's view.

23             One last thing I'll say is, as I understand your

24   Honor's rulings on the guidelines, the guidelines calculation

25   is now 87 to 108 months.

J3RVOWIS

1          THE COURT:  That's correct.

2          MS. FLETCHER:  In its submission, the government

3    sought a guideline sentence for Andrew Owimrin.  In light of

4    your Honor's sentencing earlier today for Arash Ketabchi of 87

5    months, the government's view is that given their relative

6    culpability, the Court should now sentence Andrew Owimrin below

7    the guidelines to avowed an unwarranted sentencing disparity

8    with Arash Ketabchi.

9          THE COURT:  I intend to do that.

10          MR. SCHMIDT:  Your Honor, may I briefly respond?

11          THE COURT:  Yes.

12          MR. SCHMIDT:  One, the debt relief.

13          As all the information I reviewed showed, part of the

14    sales that Brooke Marcus made to Jane Thompson was by credit

15    cards.  She had credit cards outstanding because she purchased

16    over $100,000 of other things, most of it by credit card,

17    before she came to talk to Andrew Owimrin.  So that's where the

18    credit card debt relief comes from.

19          And the government says that all these people that

20    came and they told everything -- well, first of all, one of the

21    people, Joseph McGowan, lied.  He lied about some of the stuff

22    that he tried to cover up for some of his friends.  He didn't

23    talk about his drug dealing.  And he then told his friends what

24    was going on in the cooperation so they would know, so if they

25    went in, what was actually spoken.

J3RVOWIS

1            And also, it wasn't just the people admitting to their

2       offenses.  All these other people were telling them what other

3       people did.  They knew what other people did because the other

4       people did these things.  But they did not say anything that

5       Andrew Owimrin did that was illegal, because they didn't know

6       anything that Andrew Owimrin did was illegal other than the

7       drug use, because Andrew Owimrin didn't do anything illegal

8       before that occurred.

9            THE COURT:  All right.  I understand your position.

10           Let me ask a separate question.

11           What's the position of the parties on restitution and

12      forfeiture?  Numbers.

13           MS. FLETCHER:  Your Honor, with respect to forfeiture,

14      the government, and it's in our submission on page --

15           THE COURT:  I have the numbers down.  I want you to

16      put it on the record.

17           MS. FLETCHER:  Oh, yes, your Honor.

18           The government, with respect to forfeiture, requests

19      that Andrew Owimrin forfeit $112,647.12.  And that figure comes

20      from, your Honor will recall, a spreadsheet that the government

21      introduced at trial showing check payments to Andrew Owimrin

22      during his employment at Olive Branch and A-1.

23           THE COURT:  That's the money he received?

24           MS. FLETCHER:  Yes, in check.  It doesn't include

25      additional cash payments; but it's, in the government's view, a

J3RVOWIS

1    reasonable approximation of forfeiture here.

2              THE COURT:  What's the position of the defense on the

3    forfeiture sought by the government?

4              MR. SCHMIDT:  Your Honor, we ask for a reduction of

5    $25,000 from that figure, because as the government indicated,

6    the defendants were always required -- the salesmen were always

7    required to give back --

8              THE COURT:  Where does the 25,000 come from?  I

9    understand the chargeback.  When there's a chargeback, they've

10   got to pay it back.  But where did you get 25,000 from?

11             MR. SCHMIDT:  Because Mr. Sinclair wanted the money

12   returned in cash.  We do not have records of it.  It all comes

13   from Mr. Owimrin, who said that he would guess somewhere

14   between 25 and $30,000 he had to give back in chargebacks.  I

15   took the conservative number of $25,000.

16             THE COURT:  But this is his guess; is that right?

17             MR. SCHMIDT:  This is his guess.  But we do know that

18   they had to pay back money for chargebacks, and there were lots

19   of discussions about how many chargebacks had occurred.

20             THE COURT:  Let's call it an estimate rather than a

21   guess.

22             What's the response of the government?

23             I doubt that this amount of money, with the

24   restitution, is ever going to be repaid, but it would be nice

25   to think it is.

J3RVOWIS

1               MS. FLETCHER:  We would agree, your Honor.

2               The figure that we calculate, because it only includes

3       checks and doesn't include any cash at all, in our view, any

4       discrepancy that Mr. Schmidt has identified would be offset by

5       the fact that this only includes actual documented checks paid.

6               MR. SCHMIDT:  Your Honor, there's no testimony that

7       they were paid in cash.  Nobody testified that they paid the

8       salesmen in cash, because then they couldn't deduct it.

9               THE COURT:  Wait, wait.

10              That may be a valid point.

11              Government?

12              MR. SCHMIDT:  They couldn't deduct it --

13              THE COURT:  I got the point.

14              MR. SCHMIDT:  -- taxes.

15              THE COURT:  I got the point.

16              No, wait.  What did you say about taxes?

17              MR. SCHMIDT:  If Sinclair gave money back in cash, he

18      would not be able to deduct -- if he -- excuse me.

19              If he gave money for the salespeople's commissions in

20      cash, he would not be able to deduct the salespeople's

21      commissions from the tax returns.

22              THE COURT:  Well, I don't have his tax returns

23      specifically in mind, but there seems to be a dearth of people

24      filing tax returns in this case.

25              Government, what's your position?

J3RVOWIS

1          MR. SCHMIDT:  I think we actually had --

2          THE COURT:  Government, what's your position?

3          MS. FLETCHER:  Your Honor, there was not testimony at

4    trial about Arash paying people in cash.  Arash, in fact, did

5    pay people in cash.

6          THE COURT:  But there's no testimony.

7          MS. FLETCHER:  No.

8          But, your Honor, you will recall that in the table

9    that we submitted, there is $150,000 payment to A-1 from Jane

10   Thompson.  Andrew Owimrin was entitled to, I believe, 20

11   percent of that.  And there's only a $10,000 deposit into his

12   account.  So that's one example of him clearly receiving some

13   additional payment in cash.

14         THE COURT:  All right.

15         Here's what I'm going to do.  Some of this is

16   academic.  I'm going to make the forfeiture an even $100,000.

17   I can't parse because I don't have any evidence here, and I

18   don't think either of the parties want a *Fatico* hearing on it.

19         Am I correct, Mr.  -- nobody wants a fact hearing on

20   the amount of the restitution, do they -- amount of the

21   forfeiture?

22         MR. SCHMIDT:  No, we do not.

23         THE COURT:  Government?

24         MS. FLETCHER:  No, your Honor.

25         THE COURT:  All right.

J3RVOWIS

1          I'm going to make it $100,000.  I can't parse out the

2     cash payments versus what the actual amount that isn't

3     reflected in 112 is.  So I'm going to make it an even $100,000.

4          What's the position of the parties on restitution?

5          Government, your figure is 563,427.99.

6          MS. FLETCHER:  Yes, that's the same amount as Arash.

7     And that number was arrived at by identifying all of the

8     individual victim checks that we could find into his entities.

9          It is arguably under-inclusive with respect to

10    Mr. Owimrin, because it doesn't include any victim payments

11    made to Olive Branch or the other entities for which Andrew

12    Owimrin worked.  And so our view is that it is --

13         THE COURT:  It doesn't include Olive Branch?

14         MS. FLETCHER:  It doesn't.  Because our view was that

15    at all times Andrew Owimrin's closest co-conspirator was Arash.

16    He was always working for Arash.  He was hired by Arash.

17         THE COURT:  No, I understand.  And then he went to

18    A-1; actually, then he came back to Olive Branch.

19         MS. FLETCHER:  For a very brief period of time, yes,

20    your Honor.  Then he went to another telemarketing core that's

21    not part of this.

22         So the way we arrived at that number is we actually

23    went victim by victim for Arash.  And because of Mr. Owimrin's

24    close --

25         THE COURT:  All right.  I understand.

J3RVOWIS

1              Mr. Schmidt, what's your position?

2              MR. SCHMIDT:  Your Honor, I asked the government

3     previously for the means of them coming up with that figure.  I

4     had not received it, so I do need to see --

5              THE COURT:  All right.  I'll give you 60 days.  I'll

6     give the parties 60 days to come up with an agreed-upon

7     restitution amount or to present separate figures.  And I'm

8     going to impose the $100,000 forfeiture.  And the government

9     should give me an order for that.

10             MS. FLETCHER:  We will, your Honor.

11             THE COURT:  Now, we haven't heard from Mr. Owimrin.

12             Mr. Owimrin, I realize it's late, but you can say

13    whatever you'd like, sir.  Similarly, you can ask that it be

14    adjourned till tomorrow and I would do that.  Whatever you

15    wish.

16             THE DEFENDANT:  I'd like to just say my piece.

17             THE COURT:  Of course.

18             THE DEFENDANT:  Thank you, your Honor.

19             THE COURT:  Just speak loudly and slowly.

20             THE DEFENDANT:  Absolutely.  I will.

21             First off, I want to thank your Honor for his time

22    during this entire process.  It must have been very long and

23    strenuous, I'm sure a lot of hours.  I want to thank my

24    attorneys, Mr. Schmidt, Mr. Hassen, and Sam Tureff, Mr. Tureff.

25    You know, throughout this process they've helped me out

J3RVOWIS

1    significantly and I appreciate their time.

2              I also want to thank my girlfriend, who has helped me

3    out tremendously.  I probably wouldn't have any of those

4    character letters or any of these people here.

5              THE COURT:  She gave a very strong support for you and

6    praised your sobriety.

7              THE DEFENDANT:  Yes.

8              I just want to thank everybody for being here, all my

9    friends and family.  It means a lot to have them behind me.

10             THE COURT:  You had over 40 letters praising your acts

11   of kindness.

12             THE DEFENDANT:  And that is all because of her,

13   because of my girlfriend Lizzy.  I was too ashamed to ask

14   anybody for a letter.  I was too ashamed to ask anybody to come

15   here.

16             THE COURT:  Why did you do this?  Why did you do this?

17             THE DEFENDANT:  It was an opportunity.  I believed it

18   was an opportunity.

19             THE COURT:  Yes, but at some point you realized it was

20   a -- you may not have realized it was a federal crime, but you

21   knew it was illegal.

22             THE DEFENDANT:  And at that time I had dived deep into

23   drug abuse.  And I believed it was more about getting the drug

24   than it was about having a job.  I put that drug before my

25   family, before my friends, before everybody.  I lost everything

J3RVOWlS

1    because of that drug.  I'm still fighting that addiction today.

2              That's why I didn't leave.  I was making good money;

3    it was an opportunity for me that, at 25, 24 years old, with

4    really no hope, I thought it was something that I could really

5    grab onto and do something with.  I believed it was a career.

6              THE COURT:  Were you sober when you turned down the

7    auxiliary policeman job?

8              THE DEFENDANT:  Absolutely.  Yes, sir.

9              Not that I turned it down.  I was in a place where I

10   needed a job.  I was -- we were getting evicted.  I was staying

11   at my uncle's house.  I needed a place to go.  And it was an

12   opportunity, it was a quicker opportunity.  And it was sold to

13   me as something that was legitimate, something I could grow

14   with, 401(k), benefits like that.  They said they were going to

15   grow and I could grow with them.  I believed them.  I did.

16             THE COURT:  I didn't mean to cut you off, sir.

17             Continue with what you wanted to tell me.  I see

18   you're reading, so go right ahead.

19             THE DEFENDANT:  I do also want to express my deepest

20   apologies to the victims.  I can't really put myself in their

21   shoes; I can only think about what it would be like for one of

22   my family members to go through that or myself or my

23   grandmother.  It's hard for me to talk about.  I'm ashamed of

24   it, even to speak about it in front of them.  I even described

25   this job to them as a great opportunity.  And I was ashamed to

J3RVOWIS

1    admit that it wasn't, and that I committed these crimes.

2    Knowingly or unknowingly, I did commit these crimes.  I'm

3    ashamed of it.  I regret it.

4         I've learned a lot from it.  These past two years have

5    been extremely up and down.  I have definitely learned a lot.

6    I definitely sympathize with these victims.  I know people

7    believe I do not accept responsibility, but I absolutely do

8    accept responsibility for what I did.

9         In retrospect, everything is clear.  In those moments,

10   nothing was -- I was taking $20 out of my mom's wallet to buy

11   heroin, after she worked two jobs.  Nothing was clear at that

12   moment.

13        Getting involved in this business has changed my life,

14   my family's life.  And -- excuse me.

15        THE COURT:  Take your time.

16        THE DEFENDANT:  I worry about my family.  I worry

17   about my father, who's not here.  I worry about my family,

18   about them worrying about me, about my sobriety, about my life,

19   about my future.

20        I'm not afraid of hard work.  Every bit of that

21   restitution will be paid back.  I'm not afraid of hard work.

22   I've been working with my hands.  I cut my finger in half, it's

23   stuck like this, from hard work when I was a young child.  I'm

24   not afraid of it.  I've done it my whole life.  I've gone back

25   to it.  I want to be able to continue to do that, continue to

J3RVOWIS

1   support my family, my friends, my girlfriend, my dog.

2           I believe I can be a productive part of society and

3   pay the restitution.

4           I do want to thank you again for your time.

5           I will be going back to this.  I will be going back to

6   what I did before:  Manual labor.  It's a passion for me; I

7   enjoy it.  It comes naturally to me; it comes naturally to most

8   of my -- the guys in our family -- my family.  That's what I

9   will go back to, and that's what I will do to get my life

10  together, pay the restitution to these victims, more

11  importantly.

12          I just want to thank you for your time, your Honor.

13          And thank you again for my family and friends being

14  here to support me.

15          That's all I have, your Honor.

16          Thank you for your time.

17          THE COURT:  Why is the government, in its relative

18  culpability letter, putting Mr. Owimrin at the bottom of Tier

19  3?

20          MS. FLETCHER:  Your Honor, so AUSA Sobelman thought

21  that they were alphabetical also, so I'm the one who's going to

22  take responsibility for this.

23          Here was the thinking:  Tier 1 is essentially owners

24  or operators --

25          THE COURT:  No, I read it here.  Owners or operators

J3RVOWIS

| | |
|---|---|
| 1 | and those engaged in egregious conduct.  Tier 2 is owners or |
| 2 | managers who didn't engage in the most egregious conduct.  And |
| 3 | Tier 3 is those who worked for the telemarketing companies, but |
| 4 | were not owners.  I see that. |
| 5 | MS. FLETCHER:  Kavner, Quirk, and Medeiros all had |
| 6 | what I think is fairly described as middle management roles. |
| 7 | So they are not the owners or the operators of the companies, |
| 8 | but they are junior managers.  So they have to be above Andrew |
| 9 | Owimrin. |
| 10 | Brooke Marcus was in a similar role to Andrew Owimrin, |
| 11 | but I think if you had to say which one of them was more |
| 12 | culpable, she was.  And so the two of them as being salespeople |
| 13 | or, in her case, more of a save person, are comparable in |
| 14 | culpability, but she is worse. |
| 15 | And then Tier 4 are really people who are not in even |
| 16 | the same category as the salesperson, for different reasons for |
| 17 | each of the three of them. |
| 18 | THE COURT:  All right. |
| 19 | MR. SCHMIDT:  May I say one thing, your Honor? |
| 20 | THE COURT:  Yes. |
| 21 | MR. SCHMIDT:  The difference in culpability, for |
| 22 | example, of Brooke Marcus and Andrew Owimrin was that she was |
| 23 | the one who was leading the sales to Jane Thompson.  She was |
| 24 | the only one that could have made it work.  Andrew was a little |
| 25 | bit of a mouthpiece for her, but she was the one who made it |

J3RVOWIS

1    work.

2             THE COURT:  So you're agreeing with the

3    government's --

4             MR. SCHMIDT:  I'm agreeing with the government.

5             But you could see the difference even how much apart

6    they are, because she was the one really planning and doing

7    everything for that; and clearly that was, like, the worst

8    example in this whole case.  And Andrew was really just

9    following her lead and, to some extent, Arash's lead.  And so

10   really he's substantially less than Brooke Marcus.

11            MS. FLETCHER:  Your Honor, can I respond to that?

12   Because I think this is an important point.

13            THE COURT:  Go ahead.

14            MS. FLETCHER:  Brooke Marcus has a lot of problems.

15   She will have her day before your Honor.

16            One thing that I think cuts against what Mr. Schmidt

17   just said is that there was a point where Brooke Marcus's

18   relationship with Jane Thompson turned to a sort of strange

19   friendship and where she actually, to her credit, felt bad

20   about what they had done to Jane Thompson, and told Jane to

21   make an attorney general complaint.

22            So, yes, she was absolutely instrumental to making the

23   Jane Thompson fraud work; but she also recognized her role and

24   her culpability at that moment in a way that she should be

25   commended for.  And so there is really not a significant

J3RVOWIS

1  disparity between the two of them, I think as Mr. Schmidt has

2  just indicated.

3          MR. SCHMIDT:  I just note that Jane and Ms. Marcus, at

4  the time that she felt bad about it, got Jane Thompson involved

5  with another one of her friends --

6          THE COURT:  All right.

7          MR. SCHMIDT:  -- for debt relief.

8          THE COURT:  All right.  I'm cutting this off.

9          (Pause)

10          THE COURT:  My intention is to sentence this defendant

11  to 52 months' incarceration and the remaining recommendations

12  of the probation department.

13          Please rise.

14          I hereby find the offense level is 29, the Criminal

15  History Category is I, the guideline range is 87 to 108 months.

16          Pursuant to the Sentencing Reform Act of 1984, it is

17  the judgment of this Court that the defendant, Andrew Owimrin,

18  is hereby committed to the custody of the Bureau of Prisons to

19  be imprisoned for a term of 52 months.

20          Upon release from imprisonment, Mr. Owimrin shall be

21  placed on supervised release for a term of three years, with

22  the conditions recommended by the probation department, namely,

23  the following mandatory conditions:

24          He shall not commit another federal, state, or local

25  crime; he shall not illegally possess a controlled substance;

J3RVOWIS

```
1    he shall not possess a firearm or dangerous weapon or

2    destructive device; he shall refrain from any unlawful use of a

3    controlled substance; he shall submit to one drug test within

4    15 days of his placement on supervised release and at least two

5    unscheduled drug tests thereafter as directed by his probation

6    officer; he shall cooperate in the collection of DNA as

7    directed by his probation officer.

8           He shall comply with standard conditions 1 through 13,

9    plus the following special conditions:

10          He shall submit his person, residence, place of

11   business, vehicle, and any property under his control to search

12   if there's reasonable suspicion that contraband or evidence of

13   a violation of any condition of supervised release may be

14   located.

15          He will participate in an outpatient treatment program

16   which can include testing to determine whether he has reverted

17   to using drugs or alcohol.

18          He must not incur new credit charges or open

19   additional lines of credit without the approval of his

20   probation officer, unless he's in compliance with the

21   installment payment schedule.  He must provide his probation

22   officer with access to all requested financial information.

23          He must pay all back taxes owed and work out a payment

24   plan with the IRS, and that includes during his term of

25   supervised release.
```

J3RVOWIS

1      He shall pay to the United States a special assessment

2  of $200, which is due immediately.

3      Within 72 hours of his release from custody of the

4  Bureau of Prisons, he shall report in person to the probation

5  office in the district to which he is released.

6      I'm not imposing a fine because I find he lacks the

7  ability to pay a fine, after taking into account his lack of

8  assets, his limited earning ability, and the restitution and

9  forfeiture orders I'm about to impose.

10      Actually, the restitution order is put off for 60 days

11  and the parties are to present an order to me or different

12  positions.

13      In terms of forfeiture, I am imposing a forfeiture of

14  $100,000.  The government shall submit an order to me

15  immediately.

16      I have sentenced this defendant below the guideline

17  range.  I've sentenced him to a sentence that I believe is

18  reasonable and appropriate and sufficient, but not greater than

19  necessary to meet the ends of the criminal justice system.  The

20  variance is due to his drug addiction, the fact that this is

21  his only involvement in the criminal justice system, and his

22  stated remorse, and his stated desire to repay the victims.

23      Mr. Owimrin shall surrender for service of sentence at

24  the institution designated by the Bureau of Prisons on or

25  before 2 p.m. on April 30th.

J3RVOWIS

1      Government, I take it you're not asking for remand at

2   this time?

3          MS. FLETCHER:  We are not, your Honor.

4          THE COURT:  Mr. Schmidt, do you know of any legal

5   reason why this sentence should not be imposed at this time?

6          MR. SCHMIDT:  Your Honor, I would ask that you also

7   recommend Mr. Owimrin for the RDAP program; and that he be

8   designated someplace near his family in New Jersey.

9          THE COURT:  Government, do you know of any legal

10  reason why this sentence should not be imposed as I have

11  stated?

12         MS. FLETCHER:  I do not.

13         But I did not hear Mr. Schmidt answer that question.

14         MR. SCHMIDT:  No, your Honor.

15         THE COURT:  Thank you.

16         I hereby order the sentence to be imposed as I have

17  stated it.

18         Mr. Owimrin, you have the right to appeal the sentence

19  I just imposed on you.  And if you cannot pay the cost of an

20  appeal, you have the right to apply for leave to appeal *in*

21  *forma pauperis*.  If you make a request, the Clerk of Court will

22  prepare and file a notice of appeal on your behalf immediately.

23  And if you do wish to appeal, all you have to do is tell Mr.

24  Schmidt that, and in that event, Mr. Schmidt, I'm directing you

25  to file a notice of appeal on your client's behalf, if that's

J3RVOWIS

1   what he wants.  Do you understand?

2           MR. SCHMIDT:  Yes, your Honor.

3           THE COURT:  All right.

4           I'll recommend that he be housed in the northeast

5   region in order to facilitate family visits with his -- from

6   his family, which resides in New Jersey.

7           I will recommend that he go into the RDAP program if

8   he meets the requirements of the Bureau of Prisons for that

9   program.

10          Anything else, Mr. Schmidt?

11          MR. SCHMIDT:  No, your Honor.

12          THE COURT:  Anything else, Ms. Fletcher?

13          MS. FLETCHER:  No, your Honor.

14          THE COURT:  Mr. Owimrin, you've committed very serious

15   crimes.  I think I've sentenced you quite lightly, given the

16   guideline range and all the factors in 18 U.S.C. 3553(a).

17          I hope I've made the right call here.  I expect you to

18   stay out of trouble.

19          I'm giving you three years of supervised release

20   because I want to make sure you're under the supervision of the

21   probation department.

22          Stay away from drugs.  You blamed a lot of things on

23   drugs; but you have to take responsibility yourself for what

24   you've done.

25          Stay out of trouble.  You've going to do 52 months in

J3RVOWIS

1    prison minus good time.  When you get out, just stay away from

2    all this stuff.  You're a smart person.  Use your time in

3    prison as effectively as you can.

4            And I certainly hope -- I don't mean this as a threat

5    in any way, shape or form.  But if I'm wrong and you come

6    before me again on a violation of supervised release, my

7    records will reflect the fact that I think I gave you a break

8    here.

9            So stay out of trouble.

10           Good luck to you.  Thank you.

11                          *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25